# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SHELBY DAWSON TALLCHIEF,

      Plaintiff,

v.                                         CV 11-1051 WPL/ACT

BATAAN MILITARY ACADEMY, et al.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Shelby Dawson Tallchief has been an educator for many years and founded the Bataan Military Academy ("Bataan") in Albuquerque, New Mexico, which is a public charter school affiliated with the United States Navy. Given his history with the school, Tallchief was more than distressed when he was discharged from his position as Bataan's head administrator, or Commodore, in 2010. Tallchief brought this lawsuit against Defendants Bataan Military Academy ("Bataan"), Manuel Alzaga, current principal of Bataan, the Governing Council of Bataan ("GC"), Cynthia Adair, President of the GC, and the Albuquerque Public Schools Board of Education ("APS")[1] pursuant to 42 U.S.C. § 1983, the New Mexico Tort Claims Act ("NMTCA"), and common law. (Doc. 3 Ex. 1.) He alleges six causes of action: (1) violations of procedural due process; (2) breach of contract; (3) failure to pay wages; (4) negligence; (5) defamation; and (6) breach of the duty of good faith and fair dealing. (*Id.*) Defendants counter that Tallchief's discharge was a valid response to budgetary constraints and move for summary judgment on all six claims. Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure

---

[1] I dismissed APS from this lawsuit without prejudice on December 23, 2011. (Doc. 16.) Any reference to "Defendants" excludes APS.

73(b), the parties consented to have me serve as the trial judge in this matter and to resolve all dispositive motions. Having carefully considered the facts and relevant law, I grant in part and deny in part Defendants' motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Tallchief is a licensed teacher and school administrator in New Mexico and worked for APS for sixteen years. In 2004, Tallchief began researching and writing a school charter for Bataan, and APS approved the school charter in 2006. (Doc. 65 at 2; Doc. 65 Ex. 1 at 4-5.)

After obtaining approval for the school charter, Tallchief worked under a provisional contract to start the school. (Doc. 3 Ex. 1.) During the summer of 2007, Tallchief earned approximately $53,500. (Doc. 65 at 2; Doc. 65 Ex. 2; Doc. 65 Ex. 3.)

In August 2007, the GC offered Tallchief a contract to serve as Commodore for the 2007-2008 and 2008-2009 school years. (Doc. 65 Ex. 6.) In July 2009, the GC again offered Tallchief a contract to serve as Commodore for the 2009-2010 and 2010-2011 school years that was substantively the same as the previous two-year contract. (Doc. 65 Ex. 11.) The base salary for the 2007 contract was for $84,500 per year (Doc. 65 Ex. 6; Doc. 68 Ex. 3), and the base salary for the 2009 contract was for $84,000 per year (Doc. 65 Ex. 11). Additionally, in 2007, the GC approved a salary schedule that provided for pay increases for teachers and personnel, including the Commodore, based on years of service. (Doc. 65 Ex. 26.) In July 2009 and June 2010, Tallchief submitted a Personnel Action Form to John Griffith, then President of the GC, for a salary increase pursuant to this schedule. (Doc. 65 Ex. 26 at 3.) The GC did not endorse the Personnel Action Form (Doc. 65 Ex. 10 at 1), and there is a dispute over the appropriate amount

---

[2] All facts and exhibits are undisputed unless otherwise noted.

of compensation for Tallchief in the 2009-2010 and 2010-2011 school years (Doc. 65 at 3; Doc. 68 Ex. 5 at 2).

Both contracts specified that Tallchief would be compensated on a *pro rata* basis for up to ten working days if he worked during the summer. (Doc. 65 Ex. 6 at 3; Doc. 65 Ex. 11 at 3.) Bataan did not have a summer training session in 2007 (Doc. 65 at 3; Doc. 65 Ex. 4 at 3; Doc. 65 Ex. 5 at 2), but the school held summer sessions in 2008, 2009, and 2010, and Tallchief worked at all three. (Doc. 65 Ex. 4 at 3.) Tallchief was compensated for his summer 2009 work, but not for the previous or subsequent summer. (Doc. 65 Ex. 1 at 38; Doc. 65 Ex. 12 at 2.) He also worked during winter 2007. (Doc. 65 Ex. 4 at 3.)

In addition to the terms for Tallchief's compensation, the contracts included provisions governing Tallchief's potential termination. Under both contracts, Tallchief could only be terminated for cause or "when a reduction in personnel is required as a result of . . . insufficient legislative appropriation . . . in accordance with the New Mexico Statutes and any applicable rules and regulations of the State and Local Boards of Education." (Doc. 65 Ex. 6 at 2; Doc. 65 Ex. 11 at 2.) The latter clause provides that Tallchief's contract may be cancelled in the event of a reduction in force ("RIF").

As the Commodore, Tallchief made hiring decisions on behalf of Bataan, so he was familiar with the New Mexico School Personnel Act. (Doc. 65 Ex. 1 at 5.) Tallchief testified that he never disciplined or fired an employee while acting as Commodore, but in 2008 he chose not renew the contract of an employee at the end of the 2007-2008 school year. (*Id*. at 5-6.)[3]

---

[3] Defendants have submitted an undated letter signed by Tallchief, sent to a teacher, entitled "Notice of Intent to Discharge." (Doc. 65 Ex. 8.) Based on the facts of the letter, it would have been sent around February 24, 2008. The notice informed the teacher of an intent to discharge him from his current position, and it outlined the evidence supporting the decision. (*Id*.) It concluded that the teacher had a right to appeal the discharge. (*Id*.)

The core of Tallchief's complaint against Defendants focuses on his discharge in September 2010. In the spring of 2010, Tallchief learned that the state legislature had cut funding for public schools. (Doc. 65 at 4-5; Doc. 65 Ex. 1 at 13.) Additionally, in July 2010, Tallchief learned of an additional budgetary problem: the school had exceeded its budget by approximately $65,000 during the previous school year. (Doc. 65 at 4; Doc. 65 Ex. 1 at 13.) In response, Tallchief worked with the school business manager, Michael Vigil, to address the budgetary concerns. (Doc. 65 at 5; Doc. 65 Ex. 1 at 14.) It was Tallchief's position that the most effective way to balance the budget would be through personnel reductions. (Doc. 65 Ex. 1 at 15.) Assistant Principal Jean Podborny and a secretary, Lupita Lucero, had informed Tallchief of their plans to resign, which Tallchief estimates would have saved $140,000. (Doc. 65 Ex. 1 at 49-50.) Tallchief also explored the possibility of working for no pay for a year to assist the school. (Doc. 65 Ex. 1 at 28; Doc. 65 Ex. 12.)

Tallchief met with Bataan's GC to discuss the budget on five separate occasions: August 2, August 24, September 2, September 7, and September 9, 2010. (Doc. 65 at 6.) The meeting minutes from these sessions evince a deterioration of the professional relationship between Tallchief and the GC.[4] The August 2 meeting minutes are unremarkable. (Doc. 65 Ex. 14.) The Council approved the contract for the Commodore and discussed the revenue and financial reports. (*Id*.) The meeting minutes for August 24 are equally as benign. (Doc. 65 Ex. 15.) At that time, Vigil provided the GC with budget information. (*Id.* at 1.)

By the September 2 meeting, things had changed drastically. Tallchief arrived at the meeting late and set up a tape recorder. (Doc. 65 Ex. 16 at 1.) The GC proceeded to review

---

[4] These minutes and the statements contained therein document the events and the sentiments between the parties.

Tallchief's contract and noted discrepancies between the date it was signed, the meeting minutes from that date, and the signature. (*Id.* at 2.) This prompted them to consult Bataan's attorney, Patricia Matthews. (*Id.*) The meeting reconvened later that afternoon with Matthews present in order to discuss Tallchief's employment contract and his salary. (*Id.* at 3.) Matthews explained some of the GC's concerns with the existing contract, and Tallchief responded that he believed the GC had violated his contract. (*Id.*) The minutes also report that Tallchief "believed the GC was on a witch hunt and after him." (*Id.*) Tallchief left the meeting before its adjournment. (*Id.*) After he left, Podborny joined the meeting and explained that Tallchief informed her that she might be subject to a RIF, so she had begun searching for a position elsewhere. (*Id.* at 3-4.) Podborny then told the GC that "after all that had transpired in the last [ten] days, it would be difficult to continue to work under Mr. Tallchief." (*Id.* at 4.) [5]

At the September 7 meeting, tensions still remained high. Tallchief began the closed session by presenting a letter to the GC which included "a list of conditions for the successful negotiations of changes to the Commodore's present Contract of Employment for the 2010-2011 school year." (Doc. 65 Ex. 17 at 1.) Tallchief told the GC that if his salary was "reduced by one penny," he would initiate an investigation. (*Id.* at 2.) Wanda Sartain, a GC board member, asked if this was a threat. (*Id.*) The GC also expressed its dismay that Tallchief had failed to prepare and present a balanced budget as previously requested. (*Id.* at 3.)

After about an hour of discussion, the GC asked Tallchief to leave, and it entered a closed session. (*Id.*) During the closed session, it called Matthews to discuss the meeting with Tallchief; she agreed that Tallchief's "lack of action equates to gross insubordination." (*Id.*) She then

---

[5] Testimony from Podborny also indicates that there was some friction throughout the summer of 2010. She states that the summer was very "stressful," and Tallchief was not easy to work with and had displayed some erratic behavior. (Doc. 65 Ex. 24 at 2.)

immediately advised the GC of the school's RIF policy. (*Id.*) The minutes also reflect that Matthews told the GC that it could use the RIF policy to "assist with determining whether Tallchief or Podborny is the most qualified candidate for Administrator, as Bataan can only afford to have one administrator." (*Id.*) She then sent the RIF policy to the GC and instructed the GC to inform the employees of the policy. (*Id.*)

The GC ended its closed session and resumed its agenda later that afternoon. (*Id.*) At the afternoon session's conclusion, the GC instructed Tallchief to prepare a balanced budget for the September 9 special meeting and submit it to the GC prior to the meeting. (*Id.* at 5.) Tallchief was also instructed to tell the staff of the possibility of a RIF. (*Id*; Doc. 65 at 7; Doc. 68 at 5.) Tallchief suggested, and the GC agreed, that Podborny should also create a proposed balanced budget with a RIF so that the GC would have two plans to review. (Doc. 65 Ex. 17 at 5.) Tallchief was aware that the GC would review and vote on the proposals at the next meeting. (Doc. 65 at 7.)

On September 9, 2010, the GC met for over five hours to discuss the proposed budgets and the RIF plan. (Doc. 65 Ex. 18.) At the meeting's outset, the GC provided a copy of the RIF policy to all attendees and voted to adopt the policy. (*Id.* at 3; Doc. 65 Ex. 21 (Bataan's RIF Policy).) The RIF policy requires that the GC "consider a variety of factors in determining which employees will be included in the RIF" such as their licensure, years of experience, education, performance, tenure, and any other criteria the GC thought appropriate. (Doc. 65 Ex. 21 at 2-4.) Each candidate must be assigned a numerical value based on the criteria, and the final computations and rating forms must be available for review by the employee released. (*Id.* at 4.)

After adopting the RIF policy, Tallchief and Podborny presented the GC members with their respective proposed budgets. (Doc. 65 Ex. 18 at 3.) The GC then entered a closed session,

which lasted approximately two hours. (*Id.*) The minutes from the session are sparse, but they indicate that the GC discussed the competing budget proposals. Defendants claim that the GC compared the qualifications of Podborny to those of Tallchief pursuant to the RIF policy (Doc. 65 at 8; Doc. 65 Ex. 7 at 4 (affidavit of Adair)); Tallchief disputes this fact, noting that the minutes do not reflect a numerical evaluation of the candidates (Doc. 68 at 5). With a vote of three in favor, two abstaining, the GC adopted Podborny's proposal and subjected Tallchief to the RIF policy.[6] (*Id.*; Doc. 65 Ex. 23.)

The meeting then reconvened in open session, and the motion to approve Podborny's budget and subject Tallchief to the RIF was once again heard. (Doc. 65 Ex. 18 at 4.) Tallchief was present at the open session meeting, and he heard the motion and watched the GC vote to approve the RIF. (Doc. 65 Ex. 1 at 32.) After the vote in favor of Podborny's proposal, the GC informed Tallchief that he would be placed on administrative leave until September 30, 2010, at which time the RIF would become effective. (Doc. 65 at 9.)

Up until the vote, Tallchief was allegedly unaware of the contents of Podborny's proposed budget or that there was a proposal to eliminate his position. (Doc. 68 at 7; Doc. 68 Ex. 1; Doc. 68 Ex. 5 at 2-3.) He also states that he never received any written notice that the GC intended to discharge him. (Doc. 68 at 7; Doc. 68 Ex. 5 at 3.) Tallchief also claims that after the vote he did not receive an explanation of the decision to select Podborny over him, nor did he have an opportunity to respond to the decision or dispute the criteria used. (Doc. 68 at 8; Doc. 68 Ex. 5 at 4.)

---

[6] Tallchief was not the only employee subject to the RIF, but he was the only individual to be discharged. The RIF also reduced several employees from full-time to part-time. (Doc. 65 Ex. 22; Doc. 65 Ex 25.)

Defendants object to these facts. (Doc. 70 at 3.) Their first objection is a general objection to all of Tallchief's proffered additional undisputed facts; they argue that all of the facts should be stricken because they do not comply with the local rules, which instructs parties to letter additional facts, not number them. (*Id.* at 2 (citing D.N.M.LR-Civ. 56.1(b).) While Defendants are correct, I overrule their objection. I will not overlook facts which could be outcome determinative because of a labeling error.

Next, Defendants claim that these particular facts are "supported by a self-serving and improper sham affidavit." (*Id.* at 3.) To be used in a motion for summary judgment, an affidavit must be based on personal knowledge and cannot be self-serving. *See Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995). An affidavit is considered self-serving when there is no factual basis for its inferences. *Id.* For example, the Tenth Circuit found that an employee's affidavit that he never saw a company policy manual, despite the fact that he worked at that insurance company for seventeen years, was self-serving. *McGuire v. Am. Family Mut. Ins. Co.*, 448 F. App'x 801, 813 n.8 (10th Cir. 2011) (citing *Murray*, 45 F.3d at 1422) (unpublished). This circuit also held that an affidavit alleging that police officers were not terminated after they had violated laws such as killing an endangered species, domestic battery, spray-painting graffiti, and shooting a dog was self-serving when there was absolutely no evidence that any of these crimes had ever happened. *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n.4 (10th Cir. 2004).

Taken together, *McGuire* and *Salguero* demonstrate that the Court should strike an affidavit when its statements have no support in the record. For example, if an employee works for a company for seventeen years, it is highly unlikely that he never saw an important policy manual. This is why the *McGuire* court held that the affiant needed to show additional facts to support a claim. Likewise, in *Salguero*, the claim that officers had committed crimes was self-

8

serving because it would be easy to uncover evidence to support the claim that such crimes were in fact committed.

Turning to Tallchief's affidavit, I find first that it satisfies the personal-knowledge requirement because it recounts events and information of which he was aware or not aware. Moreover, I believe there is a factual basis for his statements. This basis lies in the noticeable absence of conflicting evidence, specifically in the meeting minutes. (*See* Doc. 65 Exs. 14-18.) Tallchief notes that events did not occur; the meeting minutes, taken contemporaneously with these events, do not reflect that these events occurred either, and their silence lends credence to his narrative. First, there is no evidence that the GC directly informed Tallchief that he might be subject to a RIF. The only mention of Tallchief being subject to a RIF prior to the announcement of his discharge on September 9, 2010, occurred in a closed session of the GC, after Tallchief had been asked to leave the meeting. (Doc. 65 Ex. 17 at 3.) The fact that the GC held a discussion about subjecting Tallchief to the RIF in private reinforces Tallchief's assertion that he did not have notice. Second, the minutes from September 9, 2010, make no mention of discussing or explaining the decision-making process during the final open session. (Doc. 65 Ex. 18 at 4.) Similarly, there is also no mention of asking Tallchief if he would like to speak or respond to the charges. In fact, the meeting ended shortly after the announcement was made. (Doc. 65 Ex. 18 at 3-4.) The minutes from the meetings leading up to this decision are detailed, especially with regard to Tallchief's statements and requests. Since contradictory evidence is not readily apparent in the meeting minutes, I cannot find that the affidavit is self-serving. Therefore, I will not strike the affidavit, and I will consider these proffered facts as disputed.[7]

---

[7] Defendants also object to Tallchief's assertions that he was not provided an explanation of their evaluation and that he did not have an opportunity to respond as "argumentative, conclusive, and do not serve as facts." (Doc. 70 at 4.) I disagree. These are two statements of fact. He is claiming that two events did not occur. I overrule this objection to Tallchief's facts, but I will accept them as in dispute.

After Tallchief was discharged, relations between him and the GC grew more strained. On September 13, 2010, Tallchief penned a letter to the GC affirming that he was to be on paid administrative leave until September 30, 2010, requesting an accounting of his vacation and sick leave and payment for such untaken leave, and listing missing personal items that had not been returned to him. (Doc. 65 Ex. 9.) He requested that another time be arranged for him to collect all of his belongings. (*Id.*)

On September 21, 2010, Tallchief received a letter dated September 14, 2010, from Cynthia Adair, acting on behalf of the GC. (Doc. 65 Ex. 10; Doc. 65 Ex. 26 at 2.) Adair informed Tallchief that the GC had reviewed his employment contract and noted a discrepancy between the salary stated in his contract and his actual salary. (Doc. 65 Ex.10.) The letter claimed that his employment contract from July 2009 indicated a base salary of $84,000, but that a personnel action form, not endorsed by the GC, specified a salary of $94,315. The letter concluded that Tallchief had been overpaid by $12,298.65 and requested that Tallchief provide evidence that the GC approved this increase in salary. (*Id.*) It warned that failure to provide such evidence by September 21, 2010, would result in the deduction of this amount from Tallchief's final pay. (*Id.*)

During a September 25, 2010, public meeting of students and parents, Adair allegedly announced that Tallchief would no longer be working for the school because there were "missing funds." (Doc. 65 Ex. 26 at 2; Doc. 68 Ex. 1 at 6.)[8]

A week later, in a letter to Matthews dated October 1, 2010, Tallchief reiterated his requests from the September 13 letter. (Doc. 68 Ex. 11B.)

---

[8] Defendants argue that there is no proof of this fact, so they would likely dispute it. (Doc. 70 at 12-13.) Further, John Griffith testified in a deposition that he did not recall any statements made about an investigation into finances during the meeting. (Doc. 65 Ex. 4 at 4.)

After being discharged, Tallchief never requested a public hearing or appealed the termination decision. (Doc. 65 Ex. 1 at 7-8.) He claims that he never received written notice of the intent to discharge him, nor did he receive a written notice of his right to request an appeal of the GC's decision to terminate him under the RIF policy. (*Id*. at 7-9; Doc. 68 at 6.) It was Tallchief's understanding that the GC and Bataan were required to formally serve such a notice on him. (Doc. 65 Ex. 1 at 9.)

On December 7, 2010, Tallchief sent Podborny, the GC, the superintendent, the New Mexico Public School Insurance Authority, and the Secretary of Education a tort claim notice. (Doc. 65 Ex. 26.) The notice outlined his tort claims and served as a demand for immediate payment of his final salary, accrued vacation and sick leave, and two unpaid summer terms. (*Id*. at 4.) It also requested that he be reinstated and placed on unpaid leave through the end of the 2010-2011 school year, that he be paid an unspecified amount for "the outrage, humiliation and defamation" he had suffered, and that Adair publically apologize to him and then resign. (*Id*.) He stated that the parties had until December 22, 2010, to contact him or he would initiate litigation. (*Id*.)

## STANDARD OF REVIEW

Defendants move for summary judgment on all of Tallchief's claims, with the exception of a select few of Tallchief's wage claims. (Doc. 65.) Tallchief notes in response that Defendants have truly moved for judgment on the pleadings with respect to his claims for breach of contract, due process violations by Bataan and the GC, and breach of the duty of good faith and fair dealing. (Doc. 68 at 2.) Defendants have alleged that Tallchief has failed to state a claim, and Tallchief asserts that these arguments should be reviewed under the standards of Federal Rule of

Civil Procedure 12 and not the summary judgment standard of Rule 56. (*Id.*) Defendants do not object to this approach in their reply. (Doc. 70.)

When the parties move to dismiss the case but present matters outside of the pleadings to the court, then under Rule 12(d) the parties or the court may convert the motion to dismiss or the motion for judgment on the pleadings into a motion for summary judgment. FED. R. CIV. P. 12(d). While the Federal Rules of Civil Procedure do not provide for "reverse conversion," logic and two other courts support this notion. The Second Circuit has clarified that "[w]hen appropriate, a trial judge may dismiss for failure to state a cause of action upon a motion for summary judgment." *Schwartz v. Compagnie General Trasatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *see also Katz v. Molic*, 128 F.R.D. 35, 38 (S.D.N.Y. 1989). The court does not need to provide notice to the parties of this conversion to a motion to dismiss since notice will not change the documentation that the parties submit to the court. *Katz*, 128 F.R.D. at 38.

Conversion to a motion for judgment on the pleadings is appropriate here with respect to Defendants' arguments regarding failure to state a claim for breach of contract, municipal liability under § 1983, and a breach of the duty of good faith and fair dealing. The motion does not rely on any extrinsic materials and is based on the pleadings alone. Thus, I will analyze these three arguments under the rubric of Rule 12, not Rule 56.

## I.     Rule 12(c): Judgment on the Pleadings

A motion for judgment on the pleadings for failure to state a claim is reviewed under the same standard as a motion to dismiss for failure to state a claim. *See Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) ("[W]e review a dismissal on the pleadings pursuant to FED. R. CIV. P. 12(c) under the same standard applicable to a 12(b)(6) dismissal."); *Mock v. T.G. & Y. Sorres Co.*, 971 F.2d 522, 528 (10th Cir. 1992). Rule 12(b)(6) authorizes a court to dismiss a complaint

in whole or in part for failing to state a claim upon which relief is available. In considering motions for failure to state a claim, courts must look within the four corners of the complaint, accept all well-pleaded factual allegations as true, and determine if the plaintiff is plausibly entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (citations omitted); *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008); *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) (citation omitted). The court must make all reasonable inferences from the pleadings in favor of the non-moving party. *Park Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006).

While the complaint need not include "detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). The factual allegations must also suffice to "inform the defendants of the actual grounds of the claim against them." *Robbins*, 519 F.3d at 1248. The degree of specificity required depends on the nature of the complaint, but generally the complaint must specify the time, place, and person involved in the matter at issue. *Id.* (citations omitted).

## II.    Rule 56: Summary Judgment

Summary judgment is generally appropriate where the pleadings, discovery materials, and affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could

find in favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted).

DISCUSSION

**I.     Procedural Due Process**

Tallchief alleges that Defendants violated his Fourteenth Amendment due process rights when they discharged him from his position as Commodore. (Doc. 3 Ex. 1 at 9.) Defendants move for judgment on the pleadings on the ground that Tallchief has failed to meet the *Monell*[9] standard for alleging a § 1983 claim against a municipality. Additionally, Defendants move for summary judgment, arguing: (1) Adair is entitled to qualified immunity; (2) Tallchief did not have a property interest in his employment; (3) Tallchief received constitutionally sufficient due process; and (4) Tallchief is barred from bring this claim under the doctrine of administrative exhaustion. (Doc. 65 at 16-26.) Tallchief concedes that Adair is entitled to qualified immunity and clarifies that his § 1983 due process claim is against Bataan and the GC only. (Doc. 68 at 2.) Since Tallchief asserts that he never brought a § 1983 procedural due process claim against Adair, I cannot grant judgment in her favor. For the sake of clarity, though, I find that the § 1983 claim is limited to Bataan and the GC.[10] I turn now to the contested arguments.

*A.  Failure to State a Claim Under* Monell

Defendants argue that Tallchief has failed to properly allege municipal liability under § 1983 against Bataan or the GC. (Doc. 65 at 33.) Bataan is a public charter school, so the principles of municipal liability, as articulated by *Monell* and its progeny, apply. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010). *Monell* stands for

---

[9] *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1974).

[10] It is not entirely clear what the functional difference is between bringing a claim against Bataan and bringing a claim against the GC. However, the Defendants have not moved to dismiss either Bataan or the GC as moot, so I will consider the claims against both parties.

the basic proposition that a municipality cannot be liable for a constitutional violation under a mere *respondeat superior* theory of liability. 436 U.S. at 690-91. Defendants assert that municipal liability must instead be based on an assertion that the constitutional injury was the result of a policy or custom. (Doc. 65 at 33 (citing *Monell*, 436 U.S. at 691).) However, Defendants provide too narrow an interpretation of municipal liability. Liability may also be premised on

> a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body -- whether or not that body had taken similar action in the past or intended to do so in the future -- because even a single decision by such a body unquestionably constitutes an act of official government policy.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Here, Tallchief has quite clearly alleged that a single decision by Bataan's properly constituted legislative body, his discharge by the GC, deprived him of procedural due process. Tallchief alleges that his employment contract was a property interest entitled to the protections of the Due Process Clause and that he was deprived of that interest when he was terminated. (Doc. 3 Ex. 1 at 8-9.) Further, he clearly articulates a claim that the GC's process was inadequate. (*Id.* at 9.) Tallchief has also alleged sufficient facts to support his claims, as is required by *Iqbal.* (Doc. 3 Ex. 1 at 3-8.) Accordingly, I deny Defendants' motion for judgment on the pleadings as to Count I.

### B. Procedural Due Process Claim

I turn now to the substance of Tallchief's constitutional claim. The Fourteenth Amendment prohibits any state or state actor from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. An analysis of a procedural due process violation consists of two inquiries: (1) whether the individual possesses a

protected interest, and, if so, (2) whether the individual was afforded the appropriate level of process. *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) (citing *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004)); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 569-570 (1972). This inquiry presents as a basic if-then formula; if an individual has a property right or interest, then he may not be deprived of that right without due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).

In the Tenth Circuit, it is "clear that when a person's employment can be terminated only for specific reasons, his or her expectation of continued employment is sufficient to invoke the protections of the *Fourteenth Amendment*." *West v. Grand Cnty.*, 967 F.2d 362, 366 (10th Cir. 1992) (emphasis in original); *see also Copelin-Brown v. N.M. State Pers. Office*, 399 F.3d 1248, 1254 (10th Cir. 2005). When an employee may only be terminated for cause or for reasons associated with lack of funding, that employee has a protected property interest in his employment. *West*, 967 F.2d at 366.

Tallchief's employment contract with Bataan clearly states that he may only be terminated for cause or pursuant to a valid RIF. (Doc. 65 Ex. 11 at 2.) Under *West*, Tallchief has a protected property interest and is entitled to constitutionally adequate due process.

Adequate process is comprised of a pre-termination hearing and a post-termination hearing. *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998). Defendants insist that Tallchief was not entitled to a pre-termination hearing, even if his employment constitutes a protected property right, since the GC discharged him pursuant to a bona fide RIF. (Doc. 65 at 17-19.) In *West*, the Tenth Circuit noted that two other circuits have "suggested" that the procedural requirement of a pre-termination hearing is not necessary when the employee is subject to a bona fide RIF. 967 F.2d at 367 (citing *Am. Fed'n of Gov't Emps. v. Office of Pers.*

16

*Mgmt.*, 821 F.2d 761 (D.C. Cir. 1987); *Praprotnik v. City of St. Louis,* 798 F.2d 1168 (8th Cir 1986), *rev'd on other grounds*, 486 U.S. 112 (1988)). *West* expressly declined to consider the merits of such a rule, adopting instead the approach of the Seventh Circuit. *Id*. at 387 (citing *Misek v. City of Chicago*, 783 F.2d 98 (7th Cir. 1986)). The court explained that, like in *Misek*, the employee had alleged that the RIF was a "a subterfuge designed to terminate her without establishing the required cause." *Id*. Accordingly, the court believed that simply labeling a discharge as a RIF when there are allegations that the RIF was a sham would not affect an individual's entitlement to a pre-termination hearing. *Id*. at 368.

Tallchief, like the plaintiff in *West*, has alleged that the RIF was a sham and not a bona fide application of the policy. (Doc. 68 at 17.) Furthermore, there is a genuine issue of fact on this point. While Defendants rely on the evidence indicating that Bataan suffered from legitimate budget constraints to support the validity of the RIF (Doc. 65 at 18-19), the meeting minutes from the meetings in September 2010 indicate that there was no love lost between the parties (Doc. 65 Exs. 16, 17). In fact, the minutes from September 7 are particularly striking, as they record Matthews as stating that Tallchief's "lack of action equates to gross insubordination" and then immediately advising the GC that Bataan "needs a solid Reduction in Force Plan/Policy." (Doc. 65 Ex. 17 at 3.) The juxtaposition of the two statements is suspect, and an inference may be drawn that the RIF was used to discharge Tallchief because of perceived insubordination.

Furthermore, under a strict application of the RIF plan, the GC was bound by its own policies to assign numerical weight to the qualifications of Tallchief and Podborny before selecting between the two candidates. (Doc. 65 Ex. 21 at 2-5.) Tallchief correctly notes that the minutes from the September 9 closed session lack any thorough discussion of Tallchief's or Podborny's individual qualifications pursuant to this policy. There is no evidence in the record to

show that GC numerically ranked the candidates, aside from the vague testimony of Adair that the GC "went through the criteria ranking portion of [the RIF] procedure and compared the qualifications." (Doc. 65 Ex. 7 at 4.)

Between Tallchief's testimony that the RIF was a sham, the minutes, and the absence of the numerical rankings, Tallchief has created an issue of fact as to whether the RIF was bona fide. Accordingly, under *West*, the use of the RIF clause to terminate Tallchief's employment does not supersede the due process requirements.

Tallchief alleges that he was deprived an adequate pre-termination hearing; Defendants counter that it was constitutionally sufficient. In cases where the property interest is employment, the employee has a right to a pre-termination hearing, but the procedures need not be elaborate. *Loudermill*, 470 U.S at 545; *West*, 967 at 367; *Powell v. Mikulecky*, 891 F.2d 1454, 1458-59 (10th Cir. 1989). A public employee, such as a school administrator, is entitled to (1) oral or written notice of the charges against him or her; (2) an explanation of the employer's evidence; and (3) an opportunity to present his or her side of the story. *Riggins*, 572 F.3d at 1108 (citing *Montgomery*, 365 F.3d at 936); *see also Loudermill*, 470 U.S. at 546 (holding the pre-termination hearing need be no more than oral or written notice of the charges against the employee and an opportunity to "present his side of the story").

This circuit has made it clear that informal, oral notification can satisfy this constitutional safeguard. In *West*, a two-hour long meeting between a secretary and her future boss in which the secretary learned that her job was "in jeopardy" and they discussed her rights under the personnel policy satisfied the hearing requirement. 967 F.2d at 368. The court believed that a "brief face-to-face meeting with a supervisor provides sufficient notice and opportunity to respond to satisfy the pre-termination due process requirements of *Loudermill*." *Id*.

In *Powell*, the court held that a brief conversation between a firefighter and the city fire chief, Oates, also satisfied the pre-termination hearing requirement. 891 F.2d at 1459. Oates learned that Powell, the firefighter, had engaged in conversations with another city's fire chief about a matter that was presently being negotiated between the city and the firefighter's union. *Id.* at 1455. Oates believed that Powell's conduct was inappropriate and recommended to the city that Powell be discharged. *Id*. The City provided Oates with conditional authorization to discharge Powell if Powell admitted that he had engaged in these conversations. *Id*. Oates confronted Powell about the conversations, and Powell admitted to having them. Oates then discharged him; Powell responded that he was not going to say anything until he had spoken to an attorney. *Id.*

The court held Powell was given adequate notice because he received oral notice of the charges against him when Oates confronted him. The court believed that "the conversation was, itself, the notification of the charges against him." *Id*. at 1459. Further, Powell had an opportunity to respond, but he chose to admit the allegations, and then Powell, not Oates, ended the conversation and thus waived his right to respond further. *Id.*

Considering *West* and *Powell*, it is clear that the requirements of notice and an explanation of the evidence are quite minimal. Oral notice is sufficient, and it need not be direct. *West* indicates that general conversations about the possibility of losing one's job are sufficient. *Powell* also shows that pointed questions which reveal specific concerns about an employee's performance or the security of their position constitutes sufficient notice. In fact, the moment of notice can be the same as the opportunity to respond.

Tallchief attests he had no notice that his job was in jeopardy until after the final decision was made. (Doc. 68 Ex. 5 at 2-3.) He claims that he also never saw Podborny's budget proposal.

(*Id*. at 3.) Furthermore, he states that the GC never informed him of the evidence supporting his termination and replacing him with Podborny. (*Id*.) Lastly, Tallchief attests that he was never given an opportunity to respond to the announcement of the discharge. (*Id*.) As previously discussed, the meeting minutes are conspicuously devoid of evidence to the contrary.

Defendants argue that the totality of the circumstances indicate that Tallchief had notice because he and the GC had considered many options and positions for Tallchief and Tallchief had been given a copy of the RIF policy. (Doc. 65 at 22.) Essentially, Defendants present an argument of constructive notice, or that he should have been aware of the fact that a RIF of his position was among the options for addressing the budget crisis. However, these facts cannot overwhelm those offered by Tallchief. Tallchief has met his prima facie burden of showing he was denied a pre-termination hearing. Since the failure to provide a pre-termination hearing, regardless of the sufficiency of the post-termination hearing, constitutes a due process violation, *see Riggins*, 572 F.3d at 1108 n.2, I must deny Defendants' motion for summary judgment on Count I.

### C. Affirmative Defense: Administrative Exhaustion

Defendants raise the affirmative defense of failure to exhaust administrative remedies. (Doc. 65 at 25.) They argue that Tallchief waived his right to a post-termination hearing and is therefore barred from bringing his due process claim. (*Id*.) However, administrative exhaustion is not a prerequisite to an action under § 1983, with few exceptions. *Heck v. Humphrey*, 512 U.S. 477, 480-481 (1994); *Patsy v. Bd. of Regents*, 457 U.S. 496, 501 (1982). Procedural due process for government employees is not one of them. Accordingly, I will not consider this defense since it cannot apply to Tallchief's § 1983 claim.

**II.      Breach of Contract**

Defendants attack the validity of Tallchief's contract claim under both Rule 12 and Rule 56. They argue that Tallchief's breach of contract claim fails the *Iqbal* pleading standards and is merely a conclusory recitation of the cause of action. They also argue that the contract was not breached since it was cancelled pursuant to the RIF provision. I will address each argument in turn.

In order to state a claim for breach of contract, Tallchief's complaint must allege facts to show the existence of a contract, a breach, causation, and damages. *See Camino Real Mobile Home Park P'ship v. Wolfe*, 891 P.2d 1190, 1196 (N.M 1995). Defendants acknowledge that Count II of Tallchief's complaint states these elements but argue that these are improperly conclusory under *Iqbal*. (Doc. 65 at 31.) In support, Defendants rely on a recent case from this district, *Wagner Equipment Co. v. Wood*, No. 11cv-466 MV/ACT, 2012 WL 988022, at *3 (D.N.M. March 20, 2012), which dismissed a breach of contract claim for failing to support the recitation of the elements with facts. In *Wagner Equipment*, the complaint failed to specify which provision of the contract defendants breached, how they breached it, how that breach caused damages, or what constituted the damages. 2012 WL 988022, at *3.

This case is easily distinguishable from *Wagner Equipment*, and I believe Defendants' argument overlooks the six and a half pages of factual allegations prior to Tallchief's recitation of Count II. All four of the elements of a breach of contract are properly supported by facts alleged in the earlier portion of the complaint.

Tallchief properly alleges the existence of a contract. (Doc. 3 Ex. 1 at 3 ("Tallchief served as administrator . . . pursuant to written employment agreements . . . ."), 4 ("On or about

August 2, 2009, the [GC] voted on, approved and [sic] a new two-year contract to employ Tallchief as Commodore principal for the 2009-2010 and 2010-2011 school years.").)

Tallchief properly alleges that the GC breached his contract when he claims that he fulfilled his contract requirements but was not paid for his work. (*Id.* at 4-5, 8.) He also claims that he was fired pursuant to the RIF provision (*id.* at 5), but that his termination was wrongful (*id.* at 6). On a motion for judgment on the pleadings, I may make reasonable inferences in favor of the nonmoving party, and it seems reasonable that these two allegations, when read in tandem, indicate that the alleged breach was the misapplication of the RIF provision that resulted in Tallchief's termination.

Tallchief also alleges causation and damages. As a direct result of his termination, he suffered financial damages in the form of lost wages. (Doc. 3 Ex. 1 at 6-8.) Additionally he notes that his retirement is approximately $950 per month less than what it would have been had he completed the 2010-2011 school year. (*Id.* at 7.)

Taken as a whole, the complaint puts the Defendants on notice of the nature and facts supporting his claim. Unlike in *Wagner Equipment*, where the contract at issue was a vague settlement agreement, this was an employment contract and Tallchief was terminated pursuant to a RIF provision; given the nature of the claim and the facts of the case, it does not take a great deal of effort to deduce where Tallchief believes breach lies. *See generally Robbins*, 519 F.3d at 1248 (holding that the degree of specificity required depends on the nature of the complaint.) Defendants' motion for judgment on the pleadings as to Count II must be denied.

Lastly, Defendants move for summary judgment on the ground that there was no breach of contract because Tallchief was discharged pursuant to the RIF provision. While it is clear that the contract provides for cancellation when a RIF is necessary, it requires that the RIF be

22

performed "in accordance with the New Mexico Statutes and any applicable rules and regulations of the State and Local Boards of Education." (Doc. 65 Ex. 11 at 2.) As previously discussed, there is a genuine issue of fact as to whether the RIF was bona fide and whether it was implemented pursuant to the dictates of the school's policy. Since these facts are unresolved, I must deny summary judgment on Count II.

### III.    Failure to Pay Wages

Tallchief alleges that Bataan failed to pay him wages for work done during summer 2007, winter 2007, summer 2008, summer 2009, and summer 2010, and that Bataan owes him his final two paychecks and accrued sick and vacation leave. (Doc. 3 Ex. 1 at 4-5, 8.) Defendants move for summary judgment on his claims for payment for summer 2007, winter 2007, summer 2008, and summer 2009. (Doc. 65 at 28.) Tallchief does not oppose this motion and conceded this issue. (Doc. 68 at 18.) Therefore, I enter summary judgment on these claims for Defendants. Tallchief's claims for summer 2010 wages, his final two paychecks, and for accrued sick and vacation leave remain. (Doc. 70 at 2.)

In his response, Tallchief requests that judgment be entered in favor of his contract and wage claims. (Doc. 68 at 3, 19.) Rule 56(f)(1) permits a court to enter summary judgment on a claim for a nonmovant when it has given notice and a reasonable time for the moving party to respond. However, to resolve these wage claims in favor of Tallchief, I would need to find that there is no genuine issue of material fact. FED. R. CIV. P. 56 (a). Defendants correctly note in reply that there are disputed facts concerning Tallchief's proper salary and whether the summer training could qualify for payment since it may or may not involve academic curricula. (Doc. 70 at 7; *see also* Doc. 65 at 3 (stating salary was $84,500 and summer sessions were not for academic purposes); Doc. 68 at 3 (stating base salary was $84,500 and students were required to

attend a summer training to be eligible for school), 8 (stating contractually obligated to payment); Doc. 68 Ex. 5 at 2 (stating existence of salary schedule).) Furthermore, neither party has adequately briefed the terms of the contract or provided the appropriate documents, such as the salary schedule or the school handbook, which would be necessary if I were to attempt to resolve any legal issues regarding contract interpretation. Accordingly, I cannot enter judgment for Tallchief on these remaining claims.

### IV.     Negligence

Plaintiff brings a negligence claim against Bataan under the NMTCA. (Doc. 3 Ex. 1 at 11.) Defendants move to dismiss this claim on the grounds that Bataan has not waived immunity and negligence does not fall within the statute's seven exceptions for immunity. (Doc. 65 at 26.) Tallchief concedes this point. (Doc. 68 at 2.) Therefore, I enter summary judgment for Defendants on Count IV.

### V.     Defamation

Tallchief alleges that Bataan and Adair defamed him in the September 25 meeting by insinuating he had embezzled funds from the school. (Doc. 3 Ex. 1 at 11-12.) Defendants argue that immunity has not been waived under the NMTCA (Doc. 65 at 26-27); Tallchief concedes that Bataan should be dismissed, but argues that Adair is not entitled to immunity because she acted outside the scope of her official capacity in making the allegedly defamatory statement (Doc. 68 at 25).

Under the NMTCA, "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived [by the statute.]" N.M. STAT. ANN. § 41-4-4(a) (2012). "Scope of duty" is defined by the statute as "performing any duties that a public employee is requested, required or authorized to perform by

the governmental entity, regardless of the time and place of performance." *Id.* § 41-4-3(G). The New Mexico Supreme Court has held that acts by an employee that are unlawful, and consequently unauthorized, are not automatically outside of the scope of his or her duties. *Celaya v. Hall*, 85 P.3d 239, 245 (N.M. 2004) (citations omitted). Thus, it is not enough to show that an employee's action was unauthorized; to establish that an employee was acting outside of the scope of the employee's duties, the defendant must demonstrate "a connection between the public employee's actions at the time of the incident and the duties the public employee was 'requested, required, or authorized' to perform." *Id.* (citing N.M. ANN. STAT. § 41-4-3(G)). Moreover, whether an employee was acting outside the scope of her duties is a question of fact, so "summary judgment is not appropriate unless 'only one reasonable conclusion can be drawn' from the facts presented." *Id.* at 246 (citations omitted).

Here, Tallchief asserts that Adair was acting outside of the scope of her duties when she informed the students and teachers that he had been discharged and was under investigation "for missing funds." He argues that New Mexico law prohibits schools from publically disclosing the reasons for an employee's termination. (Doc. 68 at 25 (citing N.M. ANN. STAT. §22-10A-24(c) (2012).) However, the fact that Adair was not authorized to give the reason for termination is not enough to show that she acted outside of the scope of her duties under *Celaya*. Conversely, the burden is on Defendants to demonstrate that Adair was acting within the scope of her duties when she made the statement, and they have not made that resoundingly clear.  Therefore, this is a question of fact for the jury and summary judgment is inappropriate.

Defendants' motion for summary judgment relies exclusively on the immunity provision and fails to argue that Tallchief has not established a prima facie case for defamation. (Doc. 65 at 26-27.) It is only in their reply brief that Defendants argue Tallchief failed to show that Adair

25

made a defamatory statement or that he suffered actual damages. (Doc. 70 at 12-14.) Typically, a court will not consider arguments raised for the first time in a reply brief. *See generally ClearOne Communs., Inc. v. Bowers*, 643 F.3d 735, 782 (10th Cir. 2011); *Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.*, 636 F.3d 1300, 1306 n.3 (10th Cir. 2011); *Codner v. United States*, 17 F.3d 1331, 1332 n.2 (10th Cir. 1994). This stems from a fundamental principal of fairness, as it would deprive Tallchief the opportunity to respond to these arguments. However, I believe that these two arguments lack merit and may be resolved on the basis of the record before me.

First, Defendants argue that Tallchief has "failed to provide any type of evidence that Cynthia Adair ever made any defamatory statement against him." (Doc. 70 at 12.) Defendants claim there is an absence of affidavits which attest that she defamed him. (*Id.*) While it is true that Tallchief has not provided affidavits to that effect, there is evidence in the record to support the fact that Adair made a defamatory statement. *See* FED. R. CIV. P. 56(c)(1)(A) (stating a party may support a fact with documents in the record, interrogatory answers, or other materials). In Tallchief's December 2, 2010 tort claims notice to Bataan and the GC, he writes that "in a public meeting of students, parents and teachers Mrs. Adair announced that I would no longer be working for the school because there were 'missing funds.' The clear implication of Mrs. Adair's accusation was that I was fired for embezzling from the school . . . ." (Doc. 65 Ex. 26 at 2.) Also, in response to one of Defendants' interrogatories, Tallchief wrote that "the Governing Council told parent, teachers and the staff stated [sic] that I was under investigation for missing funds . . . ." (Doc. 68 Ex. 1 at 6.)

Defendants do not consider the tort claims notice or Tallchief's answer to their interrogatory in their reply, so they have not presented any arguments as to why either would be

inadmissible or should not be considered as evidence that Adair made a defamatory statement. I will not make these arguments for them.

Next, Defendants argue that Tallchief has offered no proof of damage to his reputation. (Doc. 70 at 14.) To establish a claim for defamation, a plaintiff must show more than emotional injury; he must show that the statement caused injury to his or her reputation. *Smith v. Durden*, 276 P.3d 943, 949 (N.M. 2012). Defendants point to Tallchief's testimony that no one from APS, a charter school, or the New Mexico Coalition of Public schools told him that he would not be offered a position because of his termination from Bataan. (Doc. 70 at 14; Doc. 70 Ex. 2 at 3.) However, during the same deposition, Tallchief testified that he believed that prospective employers knew about the statements and that it damaged his ability to obtain employment. (Doc. 70 Ex. 2 at 3.) Although he had not been directly informed this was the case, he testified that his belief stemmed from the fact that he had worked seventeen to eighteen years in the district and had good evaluations, but he "absolutely received no calls, no response from APS at all." (*Id.* at 4.) Tallchief's testimony continues to provide reasons to support his belief, but it is cut off because Defendants did not attach those pages of the deposition to the reply. Tallchief, naturally, has not had an opportunity to respond to this argument and attach supporting documents.

In addition to Tallchief's testimony, there are other documents to support his claim for damages. Tallchief's December 7, 2010 tort claims notice states, "Mrs. Adair's statements were false, outrageous and defamatory at the very least, *and have made it very difficult for me to find employment* . . . ." (Doc. 65 Ex. 26 at 3 (emphasis added).) Also, in the same answer to Defendants' interrogatory, Tallchief states that the statements "[damaged] my employment prospects." (Doc. 65 Ex. 1 at 6.)

27

At this point, I believe that Tallchief's testimony that his applications were effectively ignored, despite his qualifications, because of Adair's statement creates an issue of fact as to whether he suffered actual economic damages. Accordingly, I deny Defendants' motion for summary judgment on Count V against Adair.

## VI.   Breach of the Duty of Good Faith and Fair Dealing

Defendants' final attack is against Count VI, which alleges that Bataan violated the duty of good faith and fair dealing. This duty of good faith and fair dealing is an implied covenant, and it "protects the reasonable expectations of the parties to a contract arising from its terms." *Sanders v. FedEx Ground Package Sys.*, 188 P.3d 1200, 1202 (N.M. 2008). This covenant cannot be used to overcome an express term contained in a contract, but it does require good faith performance of those express terms. *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 cmts. a & d (1981)).

Defendants argue that since Tallchief was discharged pursuant to a bona fide RIF, and the discharge under a RIF was an enforceable provision of the contract, there can be no breach of the duty of good faith and fair dealing. (Doc. 65 at 32-33.) It is undisputed that Tallchief's contract provided for cancelation pursuant to a RIF; nonetheless, there is a genuine issue of material fact as to whether the RIF was bona fide or whether Bataan and the GC used the RIF to circumvent Tallchief's contract and terminate him for reasons unrelated to the budget. If the RIF was a sham, as Tallchief alleges, then this would undermine any finding that Defendants performed the terms of the contract in good faith.

Since the validity of the RIF is the sole argument presented by Defendants in support for summary judgment and there is an issue of fact on this matter, I deny summary judgment on Count VI.

## CONCLUSION

Defendants claim that Tallchief's discharge was a valid response to the financial difficulties Bataan faced in 2010. However, the record indicates that there are issues of fact concerning the motivations behind his discharge and the process the GC utilized to end his employment. For these reasons, I grant in part and deny in part Defendants' motion for summary judgment. I enter judgment in favor of Defendants on the following claims:

1) Count III (failure to pay wages) with respect to Tallchief's wages for summer 2007, winter 2007, summer 2008, and summer 2009;

2) Count IV (negligence); and

3) Count V (defamation) as to Bataan only.

I also dismiss Alzaga with prejudice since there are no remaining claims against him.

IT IS SO ORDERED.


_William P. Lynch_

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.